AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA Nancy Beam Winter    17-103

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Pennsylvania

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Mary Anne Leonard | ) | Case No.  17-1372-M |
| and David Shaak | ) | |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___9-3-2016 through 10-12-2017___ in the county of ___Delaware___ in the
___Eastern___ District of ___Philadelphia___, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 846 | From in or about September 3, 2016 through in or about October 12, 2017, defendants Mary Anne Leonard and David Shaak conspired and agreed, together and with each other to knowingly and intentionally distribute and dispense, outside the usual course of professional practice and not for a legitimate medical purpose, a mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), all in violation of Title 21, United States Code, Section 846. |

This criminal complaint is based on these facts:

See attached Affidavit

☐ Continued on the attached sheet.

_____
*Complainant's signature*

Andrew J. Pelczar, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___10-13-2017___

_____
*Judge's signature*

City and state: ___Philadelphia, Pennsylvania___

The Honorable Marilyn Heffley, U.S. Magistrate Judge
*Printed name and title*

17-1372-M

**AFFIDAVIT IN SUPPORT OF**
**COMPLAINT AND WARRANTS**

1.     I, ANDREW PELCZAR III, being first duly sworn, hereby depose and state as
follows:

**INTRODUCTION AND AGENT BACKGROUND**

2.     I am currently employed as a Special Agent of the Federal Bureau of
Investigation's ("FBI") Philadelphia Field Division, Newtown Square Resident Agency, which is
composed of Special Agents and local law enforcement officers investigating a wide array of
criminal violations for the geographic area of Pennsylvania's Delaware and Chester counties.  I
have been employed as an FBI Special Agent since December 2001.  In that time, I have
participated in numerous investigations of violations of federal criminal law, including cyber
crime, public corruption, money laundering, fraud, violent crime, counterterrorism and
counterintelligence matters.  I have received specialized training from the FBI Academy located
in Quantico, Virginia pertaining to these matters, in addition to other training courses.  I have
also received special training in the enforcement of laws concerning cyber crime and
investigations involving online activity, social media, and the internet.   As part of my official
duties, I have conducted physical and electronic surveillance, debriefed confidential informants,
coordinated consensual monitoring with cooperating witnesses, reviewed financial documents
and participated in the execution of numerous search and arrest warrants.

3.     Prior to becoming an FBI Special Agent, I was employed as an Intelligence
Officer with the Defense Intelligence Agency in Washington, DC.  While there, I was assigned
to the Joint Chiefs of Staff, where I analyzed counterterrorism and foreign military capabilities
issues, authored papers detailing this research, and provided intelligence briefings to senior
military and civilian officials.  Before that, I served as a Non-Commissioned Officer in the U.S.
Army's Military Intelligence Corps.

4.     I am an "investigative or law enforcement officer" within the meaning of 18
U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct
investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.

**PURPOSE OF THE AFFIDAVIT**

5.     This affidavit relates to the arrests of MARY ANNE LEONARD and DAVID
SHAAK, who from on or about September 3, 2016 through October 12, 2017, conspired and
agreed, together and with each other to knowingly and intentionally distribute and dispense,
outside the usual course of professional practice and not for a legitimate medical purpose, a
mixture and substance containing a detectable amount of oxycodone, a Schedule II controlled
substance, in violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), all in
violation of Title 21, United States Code, Section 846, all arising from LEONARD's unlawful
prescribing of oxycodone, which prescriptions she gave to her cousin-in-law SHAAK, who in
turn gave the prescriptions to persons who were not patients of LEONARD and/or any doctor

1  associated with LEONARD, and those persons filled those prescriptions and returned to SHAAK
2  and LEONARD some of the illegally prescribed pills.
3
4     6.     The facts in this affidavit come from my personal observations, my training and
5  experience, and information obtained from other law enforcement officials and witnesses. This
6  affidavit is intended to demonstrate merely that there is sufficient probable cause for the
7  requested warrants and does not set forth all of my knowledge about this matter.
8
9                                    **PROBABLE CAUSE**
10
11    7.     Defendant MARY ANNE LEONARD was a Certified Registered Nurse
12 Practitioner ("CRNP") licensed by the Commonwealth of Pennsylvania who held a Drug
13 Enforcement Administration ("DEA") registration number. A CRNP is a professional nurse
14 licensed in the Commonwealth of Pennsylvania who is certified by the Board in a specialty and
15 who, while functioning in the expanded role as a professional nurse, performs acts of medical
16 diagnosis or prescription of medical therapeutic or corrective measures in collaboration with a
17 physician licensed to practice in the Commonwealth of Pennsylvania, and in accordance with the
18 laws and regulations of that Commonwealth. LEONARD is currently employed fulltime as the
19 Director of Home Care at Dunwoody Village, a senior citizen residential complex and does not
20 maintain a separate independent medical office at which she sees any patients in collaboration
21 with a physician.
22
23    8.     Defendant DAVID SHAAK is married to MARY ANNE LEONARD's cousin.
24 SHAAK does not hold any license related to the prescribing of controlled substances.
25
26    9.     Pursuant to 49 Pa Code § 21.283, a CRNP with prescriptive authority approval
27 may, when acting in collaboration with a physician as set forth in a prescriptive authority
28 collaborative agreement and within the CRNP's specialty, prescribe and dispense drugs and give
29 written or oral orders for drugs and other medical therapeutic or corrective measures. These
30 orders may include orders for drugs, in accordance with §§ 21.284 and 21.285 (relating to
31 prescribing and dispensing parameters; and prescriptive authority collaborative agreements).
32
33    10.    Under federal law, the Controlled Substances Act governs the manufacture,
34 distribution, and dispensing of controlled substances in the United States. Under the Controlled
35 Substances Act, there are five schedules of controlled substances B Schedules I, II, III, IV, and
36 V. Controlled substances are scheduled into these levels based upon their potential for abuse,
37 among other things. For example, abuse of Schedule II controlled substances may lead to severe
38 psychological or physical dependence.
39
40    11.    Oxycodone is a narcotic analgesic that is similar to morphine and is classified as a
41 Schedule II controlled substance, sometimes prescribed under the brand name Oxycontin.
42 Oxycodone is an opoid and is used to treat severe pain, and, even if taken only in prescribed
43 amounts, can cause physical and psychological dependence. Oxycodone is used in pain relief
44 drugs in varying strengths, including 5, 10, and 15, milligram amounts. Even if taken only in
45 prescribed amounts, pills containing amounts as low as 5 milligrams of oxycodone can cause
46 physical and psychological dependence

2

12.     Title 21, United States Code, Section 841(a) (1), provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense, or possess with intent to manufacture, distribute or dispense, a controlled substance."

13.     Title 21, United States Code, Section 802(10), provides that the term "dispense" means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for delivery.

14.     Title 21, United States Code, Section 821, provides that "[t]he Attorney General [of the United States] is authorized to promulgate rules and regulations relating to the registration and control of the manufacture, distribution and dispensing of controlled substances."

15.     The Attorney General of the United States has exercised his rulemaking authority regarding the dispensing of controlled substances through the promulgation of 21 Code of Federal Regulations ' 1306.04, governing the issuance of prescriptions, which provides, among other things, that a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice. Moreover, an order purporting to be a prescription issued not in the usual course of professional treatment is not a prescription within the meaning and intent of section 309 of the Act [21 U.S.C. § 829] and the person issuing it as well as the person knowingly filling such a purported prescription, shall be subject to the penalties provided for violations of the law relating to controlled substances.

16.     The Pennsylvania Code, Title 49, § 21.284(b) provides that a CRNP shall carry out the following minimum standards when prescribing, administering or dispensing controlled substances:

(1) Initial evaluation. In a health care facility regulated by the Department of Health, the Department of Public Welfare or the Federal government, an initial medical history shall be taken and an initial physical examination shall be conducted to the extent required by the Department of Health in 28 Pa. Code (relating to health and safety) or Department of Public Welfare in 55 Pa. Code (relating to public welfare) or the Federal government in appropriate Federal regulations, whichever is applicable, and bylaws of the health care facility and its medical staff. In other practice settings, before commencing treatment that involves prescribing, administering or dispensing a controlled substance, an initial medical history shall be taken and an initial physical examination shall be conducted unless emergency circumstances justify otherwise. Alternatively, medical history and physical examination information recorded by another health care provider may be considered if the medical history was taken and the physical examination was conducted within the immediately preceding 30 days. The physical examination must include an evaluation of the heart, lungs, vital signs, pain level, and body functions that relate to the patient's specific complaint.

3

1     (2)  Reevaluations. Among the factors to be considered in determining the number and
2     frequency of follow-up evaluations that should be recommended to the patient are the
3     condition diagnosed, the controlled substance involved, expected results and possible side
4     effects. For chronic conditions, periodic follow-up evaluations shall be recommended to
5     monitor the effectiveness of the controlled substance in achieving the intended results.
6     (3)  Patient counseling. Appropriate counseling shall be given to the patient regarding the
7     condition diagnosed and the controlled substance prescribed, administered or dispensed.
8     Unless the patient is in an inpatient care setting, the patient shall be specifically
9     counseled about dosage levels, instructions for use, frequency and duration of use and
10     possible side effects.
11     (4)  Medical records. In a health care facility regulated by the Department of Health, the
12     Department of Public Welfare or the Federal government, information pertaining to the
13     prescription, administration or dispensation of a controlled substance shall be entered in
14     the medical records of the patient and the health care facility under 28 Pa. Code or 55 Pa.
15     Code or appropriate Federal regulations, whichever is applicable, and bylaws of the
16     health care facility and its medical staff. In other practice settings, certain information
17     shall be recorded in the patient's medical record on each occasion when a controlled
18     substance is prescribed, administered or dispensed. This information must include the
19     name of the controlled substance, its strength, the quantity and the date it was prescribed,
20     administered or dispensed. On the initial occasion when a controlled substance is
21     prescribed, administered or dispensed to a patient, the medical record must also include a
22     specification of the symptoms observed and reported, the diagnosis of the condition for
23     which the controlled substance is being given and the directions given to the patient for
24     the use of the controlled substance. If the same controlled substance continues to be
25     prescribed, administered or dispensed, the medical record must reflect changes in the
26     symptoms observed and reported, in the diagnosis of the condition for which the
27     controlled substance is being given and in the directions given to the patient.
28
29     17.    Accordingly, as a CRNP, defendant MARY ANNE LEONARD was authorized to
30 dispense Schedule II controlled substances only to patients she examined for legitimate medical
31 purposes and in the usual course of professional practice.
32
33     18.    At the end of September 2017, your affiant received a request from officers of the
34 Ridley Township Police Department ("RTPD") to initiate an investigation pertaining to
35 LEONARD.  The RTPD had been communicating with a Confidential Human Source
36 (hereinafter referred to as CHS-1) who had reported he was presently being issued prescriptions
37 for Oxycodone pills by LEONARD.  CHS-1 advised this affiant that he never had been
38 physically examined by LEONARD, was not being treated in any fashion, and had only ever
39 been with her on two occasions.  One of these occasions included a meeting in a car with
40 LEONARD and DAVID SHAAK.  Prior to this meeting in the car, SHAAK had given CHS-1 a
41 prescription for Oxycodone written by LEONARD.  While in the car, CHS-1 turned over a
42 portion of the Oxycodone pills he had just received from a pharmacy to SHAAK.  SHAAK took
43 these pills, and handed a portion of them to LEONARD.  CHS-1 then saw LEONARD ingest
44 some of the same pills that had been prescribed to CHS-1.  CHS-1's other meeting with
45 LEONARD occurred at a residence.
46

4

19.   CHS-1 described a scheme whereby he was first approached by SHAAK and offered the opportunity to receive prescriptions from LEONARD in return for kicking back to SHAAK and LEONARD a portion of the pills. CHS-1 estimated he had received prescriptions for Oxycodone 15 mg. pills from LEONARD every two weeks for approximately one year. CHS-1 explained that approximately every two weeks he would meet with SHAAK to receive a handwritten prescription signed by LEONARD. SHAAK and CHS-1 then would go together to a nearby pharmacy and CHS-1 would have this prescription filled. CHS-1 would leave the pharmacy, meet SHAAK, and turn over a portion of the Oxycodone pills to him. CHS-1 understood SHAAK to keep some of these pills for himself and give some to LEONARD, outside of CHS-1's presence. CHS-1 estimated he kicked back approximately 40% of his filled prescription amount to SHAAK. On at least one occasion, SHAAK offered to purchase CHS-1's share of the pills. CHS-1 understood LEONARD and SHAAK to be related, with LEONARD and SHAAK's wife being sisters or cousins.

20.   On October 11, 2017, in a recorded a phone call between CHS-1 and SHAAK to coordinate the logistics of picking up his latest prescription from LEONARD, filling that prescription, and then turning over some of the pills to SHAAK, the two discussed that CHS-1 had previously heard LEONARD was out of town and asked SHAAK if she were back. SHAAK stated she had returned, adding, "She's home or she wouldn't have wrote it for me."

21.   On October 11, 2017, this affiant and other law enforcement officials conducted surveillance when CHS-1 met SHAAK in a parking lot across from the Woodlyn Pharmacy, 1301 Jefferson Avenue, Woodlyn, PA and SHAAK gave CHS-1 a prescription signed by LEONARD. CHS-1 then entered the pharmacy, but returned to SHAAK, advising he could not fill the prescription because he did not have any identification.  The two made arrangements to meet again the following day to get the prescription filled.

22.   On October 12, 2017, a Ridley Township Police Officer contacted LEONARD at the phone number provided on her prescriptions. The Officer reported to LEONARD that they had stopped CHS-1 with pills and needed to know if he was in fact a patient of LEONARD's. LEONARD then claimed that CHS-1 was a patient and said that "he's legit."  In recorded conversations that day, CHS-1 and SHAAK discussed this call and discussed how CHS-1 could have been arrested. SHAAK said that he spoke to LEONARD and that "she said she had to vouch for you to keep the pills."  SHAAk reported that "she was like yeah I do, so that's good so there's nothing to sorry about there."  SHAAK said that "she thought you were going to dodge on us with the pills and she was like I'm never gonna write" [for CHS-1] and that SHAAK and her were concerned that CHS-1 would not split the pills.  CHS-1 asked if he could actually see LEONARD to have her be his "primary doctor," so that it would appear more legitimate, "so there would be stuff on paper."  SHAAK also offered to purchase the rest of CHS-1's pills.

23.   In the evening of October 12, 2017, SHAAK met CHS-1 in a parking lot of a restaurant in Ridley Township to receive his share of the pills obtained through the prescription signed by LEONARD that SHAAK gave to CHS-1 the day before.  Agents conducted surveillance and observed CHS-1 enter the pharmacy and then meet SHAAK in the parking lot where CHS-1 gave SHAAK the bottle containing 90 Oxycodone 15 mg. pills.

5

1        24.    SHAAK was arrested in possession of those pills.  After being advised of his
2   Miranda rights, SHAAK spoke with agents.  In that statement to police, in addition to other
3   claims, some of which the agents knew to be true and some of which they knew to be false,
4   SHAAK admitted that in coordination with LEONARD, the two had been obtaining oxycodone
5   pills in this manner from CHS-1 as well as two others.  SHAAK advised that LEONARD signed
6   all the prescriptions, and that of the pills kicked back by each of the three people involved in this
7   scheme, he kept some and some went to LEONARD.  For the instant transaction, SHAAK
8   claimed he was supposed to give three pills to LEONARD
9

10       25.    In a recorded conversation between SHAAK and LEONARD later that night in
11  the presence of agents, and where the two communicated about how to get LEONARD her share
12  of the pills obtained from CHS-1, SHAAK recommended to LEONARD that she should take
13  "fifteen" and she agreed.  She later texted that SHAAK should "give them" to his wife and that
14  LEONARD would get her pills from SHAAK's wife the next day.  In that same series of texts,
15  LEONARD asked SHAAK "was everything ok when he got pulled over?"
16

17       26.    A Ridley Township Police Officer contacted LEONARD and asked her to come
18  to the police station.  LEONARD agreed to come and appeared at the Police Station.  After being
19  advised of her Miranda rights, LEONARD said that the scheme had been suggested by SHAAK.
20  She claimed that she had examined CHS-1.  She admitted that "on five to ten occasions" over the
21  last year she had written prescriptions for CHS-1 and one other person (who was one of the other
22  two mentioned in SHAAK's statement), with the intention and understanding that these two
23  would fill the prescriptions, provide a portion of the Oxycodone pills to SHAAK, and she would
24  then get a portion of those pills from SHAAK and SHAAK would retain a portion of the pills.
25  She claimed that she used these pills.  When this affiant used the term "kick back" to describe
26  getting the pills back that she had prescribed to these two persons, she said she preferred to use a
27  different term and preferred that the agent used the term "returned to her" to describe these
28  transactions.

1
2
3          **CONCLUSION**
4

5   27.  Based on all of the facts set forth in this affidavit and based on my training and
6 experience, I have probable cause to believe that from on or about September 3, 2016 through
7 October 12, 2017, MARY ANNE LEONARD and DAVID SHAAK conspired and agreed,
8 together and with each other to knowingly and intentionally distribute and dispense, outside the
9 usual course of professional practice and not for a legitimate medical purpose, a mixture and
10 substance containing a detectable amount of oxycodone, a Schedule II controlled substance, in
11 violation of Title 21, United States Code, Section 841(a)(1), (b)(1)(C), all in violation of Title 21,
12 United States Code, Section 846.

13

Respectfully submitted,

Andrew Pelczar III
Special Agent
Federal Bureau of Investigation

14 Subscribed and sworn to before me on *October  13*  , 2017
15
16
17
18
19 Honorable Marilyn Heffley
20 UNITED STATES MAGISTRATE JUDGE
21 EASTERN DISTRICT OF PENNSYLVANIA
22

7